IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH HANANALSHARAF@HOTMAIL.COM MAINTAINED AT PREMISES CONTROLLED BY MICROSOFT CORPORATION

**FILED UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Brendan M. Shelley, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Microsoft Corporation ("Microsoft"), an e-mail provider headquartered at One Microsoft Way, Redmond, Washington 98052. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Microsoft to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent employed by the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE). I am assigned to ICE Homeland Security Investigations (HSI) – Washington, D.C. I have been employed as a Special Agent with ICE since October 2007. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ICE Special Agent Training Program. My

duties as a Special Agent for ICE include investigating administrative and criminal violations of the Immigration and Nationality Act, United States customs laws and other federal criminal violations to include wire fraud, bank fraud and money laundering. Prior to becoming a Special Agent, I was an ICE Management and Program Analyst with ICE's Office of the Principal Legal Advisor.

3. The facts and information contained in this affidavit are based upon my training and experience, participation in investigations, personal knowledge and observations during the course of this investigation, as well as the observations of other agents involved in this investigation. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of records, documents and other physical evidence obtained during the course of this investigation.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1956 (Money Laundering Conspiracy), Title 18, United States Code, Section 1343 (Wire Fraud), and Title 18, United States Code, Section 1344 (Bank Fraud) have been committed by Hanan Al Sharaf. There is also probable cause to search the information described in Attachment A for evidence or instrumentalities of these crimes further described in Attachment B.

**JURISDICTION**

6. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§2703(a), (b)(1)(A) &

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**BACKGROUND INFORMATION**

8. The State of Kuwait is a country located in the Middle East. Kuwait operates embassies throughout the world, including an embassy located in Washington, D.C. The Embassy of Kuwait in Washington, D.C. oversees the operations of the Kuwait Embassy Health Ministry (also known as the Kuwait Health Office, also known as the Kuwait Health Division, herein referred to as the Health Ministry). The Health Ministry is located at 4301 Connecticut Avenue, NW, Suite 330 in Washington, D.C.

7. The mission of the Health Ministry is to pay for approved health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States. Kuwaiti citizens requiring medical attention sometimes travel to foreign countries, including the United States, in order to receive medical attention. The Health Ministry's core responsibilities are to 1) coordinate approved care provided by medical service providers, 2) arrange for medical care providers to be paid with government funds for services provided, and 3) pay patients and their families a bi-weekly stipend for travel and living expenses. All expenses associated with the operation of the Health Ministry are paid for by the Government of Kuwait.

8. In 2014, the Health Ministry office located in Washington, D.C. was overseen by Dr. Abdullah Al Wetaib and Financial Attaché Hanan Al Sharaf.

9. The Health Ministry maintains a Bank of America bank account in Washington, D.C. The account is funded each month by wire transfers originating from the Kuwaiti government.

## THE CONSPIRACY

10. There is probable cause to believe that a conspiracy was formed by certain persons working inside and outside the Kuwait Health Ministry to obtain money by fraud and to conduct financial transactions to launder the stolen proceeds for their own use and benefit. The primary purpose of the conspiracy was for members of the conspiracy to enrich themselves by embezzling funds from the Bank of America bank account maintained by the Health Ministry. The ways, manner and means by which the conspiracy was carried out included the following:

a. It was part of the conspiracy that members of the conspiracy would use checks drawn on the Health Ministry's bank account in order to make unauthorized payments to companies that did not provide any services (the "shell companies").

b. It was further part of the conspiracy that members of the conspiracy would create shell companies, using names that closely resembled actual health care providers to make them appear legitimate, in order to conceal embezzlement activity.

c. It was further part of the conspiracy that members of the conspiracy would open bank accounts for the shell companies to deposit checks payable to the shell companies drawn on the Health Ministry in order to conceal and embezzle funds.

d. It was further part of the conspiracy that members of the conspiracy would transfer embezzled funds from the shell company accounts to the bank accounts of other members of the conspiracy, and distribute embezzled funds in cash payments.

e. It was further part of the conspiracy that members of the conspiracy would access transaction records of the Health Ministry, including invoices and payment records, in order to edit information associated with prior payments.

f. It was further part of the conspiracy that members of the conspiracy attempted to conceal their embezzlement of funds by depositing checks issued by the shell companies into the Health Ministry account.

11. Co-conspirators knowingly executed a scheme to obtain money or property owned by or under the custody and control of Bank of America by false and fraudulent pretenses

in violation of Title 18 United States Code, Section 1344(2). Furthermore, the co-conspirators willfully and knowingly devised a scheme to obtain money and property by means of false pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, knowingly and intentionally caused to be transmitted by means of wire in interstate commerce writings, signs, and signals for the purpose of executing such scheme and artifice to defraud in violation of Title 18 United States Code, Sections 1343 and 2.

12. Co-conspirators agreed to embezzle approximately $2 million in Health Ministry funds. The financial records reviewed to date reveal that at least $1.4 million was paid by the Health Ministry to the shell companies.

## PROBABLE CAUSE

### A. INFORMATION PROVIDED BY MOHMAMMAD ASSAF

13. In November 2014, ICE HSI was contacted by Mohammad Assaf concerning suspected embezzlement activity at the Health Ministry in Washington, D.C. Assaf was previously employed as an accountant with the Health Ministry from approximately June 2013 until September 2014. Assaf stated he had knowledge of Health Ministry employees who were embezzling Health Ministry funds and laundering the stolen money using various shell corporations.

14. On November 3, 2014 and again on February 26, 2015, I interviewed Assaf. Assaf stated in sum and in substance:

a. Assaf was previously employed by the Health Ministry from approximately June 2013 until September 2014;

b. Assaf reported to the Finance Attaché, Hanan Al Sharaf;

c. the mission of the Health Ministry is to pay for the health care costs incurred by Kuwaiti nationals receiving medical treatment in the United States;

d. it was not uncommon for Kuwaiti nationals to travel to foreign countries, including the United States, in order to receive medical treatment;

e. Kuwait operates health ministry offices in several foreign countries, including the United States;

f. Kuwaiti nationals seeking medical attention in the United States work with the Health Ministry to prepare a letter guarantying payment of expenses for treatment of the person to be issued to the hospital providing the medical care;

g. the hospitals bill the Health Ministry directly;

h. the Health Ministry pays the hospital with funds provided by the Kuwaiti government;

i. all payments for medical care are paid with funds from the Health Ministry's bank account;

j. the Health Ministry's bank account is funded each month with a wire transfer from the Government of Kuwait;

k. the wire transfers typically range from $25 million to $30 million dollars each month, but additional funds can be wired depending on the number of people needing medical assistance or other expenses;

l. the Health Ministry maintains a bank account at a Bank of America branch located in the Van Ness neighborhood of Washington, D.C.;

m. Health Ministry employees are paid by check from the Health Ministry's Bank of America bank account;

n. Assaf was originally hired to work at the Health Ministry as an accountant and was later tasked by Al Sharaf with conducting an audit of the Health Ministry's expenses;

o. during Assaf's audit, Assaf noticed the Health Ministry's computerized accounting system allowed users to manually edit information associated with previous transactions including a patient's name, the date of a payment, the payee's information and the amount of money paid;

p. Assaf was concerned that individuals with access to the accounting system could conceal embezzlement activity by manipulating the information associated with the transactions;

q. Assaf reported his concerns to Dr. Al Wetaib and Al Sharaf;

r. Al Sharaf subsequently hired another accountant, Wael Sedik;

s. prior to the hiring of Sedik, Health Ministry checks were maintained in a central location in order to prevent unauthorized payments from being made;

t. Sedik removed the controls on the Health Ministry checks. After Sedik was hired, blank Health Ministry checks were not held in a central place but were generally accessible to employees;

u. Assaf became aware in 2014, that numerous accusations were made, including by Dr. Al Wetaib, that Al Sharaf and Sedik were involved in embezzlement activity;

v. Sedik admitted orally to Assaf to conspiring with others, including Al Sharaf, to embezzle money from the Health Ministry;

w. Sedik wrote a statement in which Sedik admitted to embezzling funds with Al Sharaf and others from the Health Ministry and gave a copy of the written statement to Assaf. Assaf understood that the statement was requested by Dr. Al Wetaib;

x. Assaf also witnessed Walid Aly, a Health Ministry employee, prepare a written statement in which Aly stated Aly had knowledge of Sedik operating UPMC, Hopiken and Med Star—the shell companies, among other things. Assaf signed this statement as a witness;

y. Al Sharaf instructed Assaf to call Sedik from Assaf's cell phone while in the Health Ministry Office, located in Washington, D.C. Al Sharaf then took the phone and placed it in speaker mode. Assaf heard Al Sharaf ask Sedik for "the documents;"

z. Assaf said that shortly thereafter, Assaf, and to Assaf's knowledge Sedik and Aly, were all terminated from their employment in or about September 2014. Assaf also believes that Al Sharaf was terminated as the Financial Attaché.

15. At the conclusion of the interview on November 3, 2014, Assaf provided me with several documents, many of which were written in Arabic. One of the documents was a written statement dated September 17, 2014 which appeared to be signed by Sedik. Assaf advised me that this is a copy of the written statement that Assaf saw Sedik author. One of the documents was a written statement dated September 12, 2014 which appeared to be signed by Aly. Assaf advised me that this is a copy of the statement Assaf observed Aly writing, and saw Aly sign.

16. On February 26, 2015, Assaf correctly identified photographs of Al Sharaf, Sedik, and Aly after being shown headshot photographs, including a known photo of Sedik and a known photo of Aly and several others persons.

B. INFORMATION CONTAINED IN THE STATEMENT OF SEDIK

17. I requested translators assigned to the U.S. Citizenship and Immigration Services Language Services Section translate the various documents previously provided by Assaf. Based on my review of the certified translations of the documents, identified as the written statement of Sedik, dated September 15, 2014, stated in sum and in substance:

a. Sedik had previously discussed an agreement with Al Sharaf under which Sedik would leave the Health Ministry so Sedik could open a business that would provide the Health Ministry with medicines;

b. Al Sharaf advised Sedik that Sedik could sell medicines while continuing to work at the Health Ministry;

c. Al Sharaf told Sedik that they (Sedik and Al Sharaf) could split any profits equally;

d. Al Sharaf wanted to make sure her name was not mentioned in any transactions so her involvement would not be known to third parties;

e. Sedik was directed by Al Sharaf to prepare invoices for services that were not provided to the Health Ministry and to issue checks in the name of third parties. Several of their conversations about this were conducted by writing on yellow paper, because according to Sedik, she thinks her offices are under surveillance;

f. Al Sharaf wanted Sedik to provide her with $2 million dollars through the embezzlement scheme;

g. Sedik and Al Sharaf agreed Al Sharaf would receive $1 million in cash;

h. Sedik and Al Sharaf agreed to establish shell companies and to create fictitious bills from the shell companies to the Health Ministry;

i. Sedik and Al Sharaf agreed even though bills would be sent to the Health Ministry, no actual services would be provided;

j. Sedik was not afraid of getting in trouble because Sedik's partner in the scheme was Sedik's superior and the person who approved payments and signs checks;

k. the first shell company (MedStar) received approximately $200,000.00 in payments from the Health Ministry;

l. the second shell company (Hopiken) received approximately $300,000.00 in payments from the Health Ministry;

m. the third shell company (BMC, known to law enforcement as UPMC) received approximately $400,000.000 in payments from the Health Ministry;

n. Al Sharaf went on vacation in September 2014;

o. when Al Sharaf returned from her vacation, she wanted to know who signed the checks in her absence, to which Sedik replied that Dr. Al Wetaib did;

p. Sedik asked Al Sharaf how she wanted her money, to which Al Sharaf replied she would tell Sedik later;

q. Al Sharaf asked for copies of those checks signed by Dr. Al Wetaib. Sedik stated that Al Sharaf told Sedik that a committee from the Ministry would be arriving and that the situation had changed;

r. in or about September 2014, Sedik learned employees of the Health Ministry were under investigation by the Kuwaiti government for embezzlement;

s. Al Sharaf tried to insinuate Sedik implicated her (Al Sharaf) in the embezzlement scheme by having her sign the checks issued to the shell companies;

t. Sedik gave Aly eight pre-signed but blank checks from a shell company to give to Al Sharaf. Sedik advised Aly that "the whole amount was not there" because people had taken their money and left;

u. A committee from the Kuwaiti government arrived to investigate the embezzlement in or about September 2014;

v. After the committee arrived, Sedik went to Dr. Al Wetaib and confessed to Sedik's and Al Sharaf's involvement in the embezzlement scheme;

w. Al Sharaf directed other Health Ministry employees to attempt to conceal her involvement in the scheme by changing payment information. Al Sharaf also instructed Sedik on what to say to the committee.

C. IDENTIFICATON OF SHELL COMPANIES INVOLVED IN POSSIBLE EMBEZZLEMENT ACTIVITY

18. In connection with this investigation, I conducted a search of the Virginia State Corporation Commission's (SCC) online database. A search for UPMC Global Services revealed a record for UPMC Global Care LLC with SCC identification number S5143021. Records checks revealed UPMC Global Care LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as July 9, 2014. The principal office is a residence located in Stafford, Virginia, which was the address of Sedik. Aly is listed as the organizer and registered agent of UPMC Global Care LLC.

19. A search for Hopiken Medical in the Virginia SCC online database revealed a record for Hopiken Medical Service INT LLC with SCC identification number S5231164. Records checks revealed Hopiken Medical Service INT LLC is a limited liability company incorporated in the state of Virginia. The date of formation and registration is listed as September 9, 2014. The principal office is a residence located in Lorton, Virginia, which is believed to be the address of Ahmed El Khebki. The registered agent is listed as El Khebki.

20. A search for Hopiken Medical revealed a record for Hopiken Medical Service, LLC with department identification number W15759335. Records checks revealed Hopiken Medical Service, LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as March 20, 2014. The principal office is located in Baltimore, Maryland. The registered agent is listed as Nasr Ahmed. A review of the Articles of Incorporation indicates Hopiken Medical Service LLC was formed to provide medical transportation services.

21. On February 18, 2015, I received and subsequently reviewed the Articles of Organization for Hopiken Medical Service INT LLC from the Virginia SCC. The Articles of

Organization identified Khebki as the resident agent of Hopiken Medical Service INT LLC. The Articles of Organization indicated Hopiken Medical Service INT LLC's registered office is located in Lorton, Virginia, which is the residence address of Khebki.

22. On February 19, 2015, I conducted a search of the Maryland Department of Assessments and Taxation Business Services online database. A search for UPMC Global Services revealed a record for UPMC Global Services LLC with department identification number W16035115. Records checks revealed UPMC Global Services LLC is a limited liability company incorporated in the state of Maryland. The date of formation and registration is listed as August 18, 2014. The principal office is located in Silver Spring, Maryland, which is believed to be the residence of Khaled Rouini. The registered agent is listed as Rouini.

23. In the course of the investigation, I conducted a search of the Maryland Department of Assessments and Taxation Business Services online database, which revealed a record for Med Star Physician LLC. Records checks revealed Med Star Physician LLC is a limited liability corporation incorporated in the state of Maryland. The principle office is located in Baltimore, Maryland. A review of the Articles of Organization indicates that Med Star Physician LLC was formed to provide transportation services.

D. REVIEW OF BANK RECORDS ASSOCIATED WITH BANK OF AMERICA ACCOUNT NUMBER XXXXXX0454

24. On December 15, 2014, I subpoenaed bank records associated with Bank of America bank account number XXXXXX0454. Bank of America bank account number XXXXXX0454 is identified as being associated with the Kuwait Health Office, Embassy of Kuwait. A review of records associated with the account revealed the Health Ministry is located at 4301 Connecticut Avenue, NW, Suite 300 in Washington, D.C. Dr. Al Wetaib and Hanan Sharaf were identified as signatories on the account.

25. A review of checks authorizing payment from the Health Ministry's bank account revealed checks with the following payees:

a. Med Star Physician LLC – Baltimore, Maryland

b. UPMC Global Service – Baltimore, Maryland

c. Hopiken Medical Services – Baltimore, Maryland

d. MedStar Health TS – Baltimore, Maryland

e. Hopiken Medical Services Int – Baltimore, Maryland

26. A review of payments originating from the Health Ministry's Bank of America bank account to established health care providers revealed payments to Johns Hopkins Medicine, MedStar and UPMC Global Care. A review of the address information associated with these payments and open source public information indicates Johns Hopkins Medicine, MedStar and UPMC Global Care are established entities that provide legitimate medical services.

27. The Bank of America bank account records reviewed to date revealed that several checks issued by the Kuwait Health Ministry were deposited into bank accounts belonging to the shell companies:

| **KUWAIT HEALTH OFFICE CHECKS DEPOSITED INTO SHELL ACCOUNTS** | | | |
|---|---|---|---|
| **Date (On or About)** | **Account Holder** | **Bank** | **Amount** |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $8,766.40 |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $9,074.60 |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $9,140.70 |
| 2/24/14 | Hopiken Medical Services | Wells Fargo | $9,993.85 |
| 3/13/14 | Hopiken Medical Services | Wells Fargo | $12,657.00 |
| 4/8/14 | Hopiken Medical Services | Wells Fargo | $13,375.62 |
| 4/8/14 | Hopiken Medical Services | Wells Fargo | $11,375.62 |
| 4/8/14 | Hopiken Medical Services | Wells Fargo | $9,860.62 |
| 8/8/14 | Hopiken Medical Services | Wells Fargo | $57,483.25 |
| 8/8/14 | Hopiken Medical Services | Wells Fargo | $53,483.25 |
| 8/9/14 | Hopiken Medical Services | Wells Fargo | $59,483.25 |

28. A review of bank records for accounts held by the shell companies reviewed to date revealed that payments were made from the shell company accounts into accounts held by Huwida Fadl (then a Health Ministry employee), Wael Sedik, and Sara Kassem (Sedik's wife), among others.

### E. STATEMENTS MADE TO LAW ENFORCEMENT AGENTS BY HANAN AL SHARF

29. Hanan Al Sharaf was charged in a one count complaint with violations of Title 18, United States Code, Section 1956(h) – Conspiracy to Commit Money Laundering. On March 5, 2015, Special Agents arrested Al Sharaf as Al Sharaf was attempting to board a plane bound for the Middle East.

30. Upon arrest, after Al Sharaf was advised of her rights under *Miranda*, she made voluntary statements to law enforcement agents including the undersigned. In sum and in substance, Al Sharaf stated several individuals employed by the Health Ministry stole money from the Health Ministry by writing checks to fake companies. Al Sharaf stated she signed several checks to fake companies, but that she did not realize the companies were fake. Al Sharaf stated the names of the shell companies closely resembled the names of legitimate health care providers. Al Sharaf stated the employees involved in the embezzlement scheme would give her a large stack of paperwork in order to get her to just sign whatever was put in front of her (Al Sharaf).

31. Al Sharaf stated she became aware of the fraud in August 2014 and that she conducted her own investigation into the theft. Al Sharaf stated her investigation revealed payments to the shell companies in February 2014. Al Sharaf stated she had notes from her investigation into the shell companies stored on her cellular telephone. Al Sharaf stated she

intended to use the information she discovered during her investigation to obtain a new position with the Kuwaiti embassy so she could regain her diplomatic status.

32. During the interview, Al Sharaf also indicated she used her phone in order to access her e-mail.

F. INFORMATION OBTAINED FROM THE KUWAITI INVESTIGATIVE TEAM

33. On April 20, 2015, I met with prosecutors from the Kuwait Public Funds Prosecution Department, who were conducting an investigation into this same fraud, theft, and money laundering scheme, among others. During the meeting, I was advised that it was not uncommon for Kuwaiti government officials serving abroad to use personal e-mail accounts for government business.

G. INFORMATION RECEIVED FROM HANAN AL SHARAF'S ATTORNEY

34. On March 6, 2015, I received a copy of a lease from Al Sharaf's counsel. Attached to the lease was a screen shot from an inbox for an e-mail account belonging to Hanan Al Sharaf. The user associated with the e-mail account was listed as "Hanan Al-SHaraf," which, according to records obtained from Microsoft, is the same name and exact punctuation as the user associated with hananalsharaf@hotmail.com. The screen shot contained a list of folders from the Microsoft e-mail account inbox, which is the provider for Hotmail. This screen shot is attached as Attachment C. Included in this list were folders for "accounting departme…," and the name of Dr. Al Wetaib. Additionally, there was at least one folder named for an insurance provider that does business with the Kuwait Health Ministry. Specifically, one of the folders in the e-mail account is listed as "cigna" and in the course of my investigation into this matter, I interviewed a former Health Ministry employee who stated that Cigna did business with the

Health Ministry. Another folder is listed as "Atna incurance," which may be a mis-spelling of Aetna Insurance – a company that may also do business with the Health Ministry.

35. On May 26, 2015, I also received a copy of an e-mail sent by Al Sharaf to dr.alialobaidi@gmail.com from her hananalsharaf@hotmail.com e-mail account. This e-mail was obtained from Al Sharaf's counsel. Attached to the e-mail was a letter written by Al Sharaf to Dr. Al Wetaib, entitled "Request to investigate suspected misconduct." The letter was dated September 9, 2014, and discussed suspected financial misconduct that took place at the Health Ministry and forgery of official documents committed by Sedik.

36. From March through May 2015, I also received from Al Sharaf's counsel, copies of other documents, including payment records and correspondence gathered during Al Sharaf's investigation into the theft, including some health care records obtained from the Kuwait Health Ministry. It is not known whether Al Sharaf removed these documents from the Kuwait Health Ministry via paper, electronic storage devices, or e-mail.

37. As explained herein, the following facts alone provide more than sufficient probable cause to believe that Ms. Al Sharaf used this Hotmail e-mail account to communicate regarding her knowledge and involvement in the matters under investigation, and that such information exists in the stored content information regarding this account available through Hotmail: (1) Al Sharaf's counsel provided an e-mail from the hananalsharaf@hotmail account which he represented was an e-mail from her account which contains content directly relevant to her work at the Health Ministry; (2) Al Sharaf advised me in an interview that she conducted her own investigation of the theft scheme and that she intended to report her findings to the Health Ministry in Kuwait; (3) Al Sharaf's e-mail account contained folders labeled with topics directly relevant to this investigation; and (4) Kuwaiti government officials investigating this same fraud

and theft scheme and others advised me that Kuwaiti government employees posted abroad often use private e-mails to conduct official business.

H. INFORMATION OBTAINED FROM MICROSOFT

38. According to records obtained from Microsoft, the e-mail address hananalsharaf@hotmail.com is registered to Hanan Al Sharaf. The e-mail address was accessed over 900 times during the time period of April 2014 until September 2014, at times from IP addresses located in Washington, D.C. and Virginia.

39. On April 7, 2015, Microsoft confirmed that data associated with the e-mail address hananalsharaf@hotmail.com would be preserved for a period of 90 days. On July 7, 2015, Microsoft confirmed that the preservation would be extended for an additional period of 90 days. In general, an e-mail that is sent to a Microsoft subscriber is stored in the subscriber's "mail box" on Microsoft servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Microsoft's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Microsoft's servers for a certain period of time.

**BACKGROUND CONCERNING E-MAIL**

40. In my training and experience, I have learned that Microsoft provides a variety of on-line services, including electronic mail ("e-mail") access, to the public. Microsoft allows subscribers to obtain e-mail accounts at the domain name hotmail.com, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Microsoft. During the registration process, Microsoft asks subscribers to provide basic personal information. Therefore, the computers of Microsoft are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Microsoft subscribers) and information

concerning subscribers and their use of Microsoft services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

41. A Microsoft subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Microsoft. In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

42. In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

43. In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account

(including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

44. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

45. As explained herein, information stored in connection with an e-mail account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an e-mail account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such

as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the e-mail provider can show how and when the account was accessed or used. For example, as described below, e-mail providers typically log the Internet Protocol (IP) addresses from which users access the e-mail account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the e-mail account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Last, stored electronic data may provide relevant insight into the e-mail account owner's state of mind as it relates to the offense under investigation. For example, information in the e-mail account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

**CONCLUSION**

46. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Microsoft who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

________________________________
Brendan M. Shelley, Special Agent
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

Sworn to and subscribed to before me
this_____ day of July, 2015

______________________________________

MAGISTRATE JUDGE ROBINSON
UNITED STATES DISTRICT COURT